# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 96-CC-01298-SCT

*TERRENCE J. HALL, M.D.*

*v.*

*BOARD OF TRUSTEES OF STATE INSTITUTIONS*
*OF HIGHER LEARNING*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/21/96 |
| TRIAL JUDGE: | HON. WILLIAM F. COLEMAN |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | JOSEPH L. McNAMARA |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ED DAVIS NOBLE, JR. |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES (OTHER THAN WORKERS' COMPENSATION) |
| DISPOSITION: | AFFIRMED IN PART; REVERSED IN PART - 5/14/98 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 6/4/98 |

**BEFORE PRATHER, C.J., SMITH AND WALLER, JJ.**

**SMITH, JUSTICE, FOR THE COURT:**

¶1. The genesis of this case arises from an anonymous, written complaint against Dr. Terrence J. Hall involving allegations of sexual harassment against a female medical student. The Department of Human Resources at the University of Mississippi Medical Center (hereinafter"UMC") authorized the campus police to conduct a full-scale investigation into the allegations. After the investigation was completed, the Department of Human Resources concluded that the evidence presented showed that although UMC's sexual harassment policy was not violated, Dr. Hall's conduct constituted inappropriate behavior. As a result, Dr. Hall was issued a written reprimand. All documentation of the investigation and the written reprimand were included in Dr. Hall's personnel file.

¶2. Dr. Hall initiated a faculty grievance in accordance with the Faculty/Staff Handbook and the Procedures of UMC. At all levels of University review, including review by a Faculty Grievance Committee, Dr. Hall was denied all relief requested. Dr. Hall then appealed to the Board of Trustees of State Institutions of Higher Learning (hereinafter "the Board"), and the Board affirmed the

decision of the Faculty Grievance Committee. Dr. Hall next filed a Petition for Writ of Certiorari with the Circuit Court of the First Judicial District of Hinds County alleging that the Board's affirmance of UMC's conduct was arbitrary and capricious and in violation of his constitutional right to substantive due process. The circuit court denied all relief requested by Dr. Hall.

¶3. Dr. Hall now appeals to this Court the circuit court's denial of relief and claims that he was denied substantive due process by both UMC and, ultimately, the Board by UMC's failure to follow its internal procedures in launching an unjustified investigation and in the review thereof by failing to actually exercise professional judgment by denying him any of the relief which he sought for the wrongs done to him. The Board claims that Dr. Hall's substantive due process rights were not violated because Dr. Hall has no protected property interest as an untenured professor and no liberty interest in his reputation. We reject Dr. Hall's claim of a protected property interest and hold that Dr. Hall did have a protected liberty interest but suffered no deprivation of that liberty interest. We do, however, agree that all of the investigatory material should be removed from the personnel file. We find persuasive the procedure of ***Robinson v. Jacksonville Shipyards, Inc.***, 760 F. Supp. 1486, 1537 (M.D. Fla. 1991), and require that these materials be removed from Dr. Hall's personnel file and be placed in a confidential UMC campus police file. We accordingly affirm in part, and reverse and render in part.

## FACTS

¶4. Dr. Hall, a surgical oncologist, served in a teaching position at the University of Mississippi Medical Center (hereinafter "UMC") from 1990 until 1996. While at UMC, Dr. Hall's career was on schedule for him to eventually become eligible for tenure when in 1994, Dr. A. Wallace Connerly received a typed, anonymous letter containing specific allegations of sexual harassment against Dr. Hall.

¶5. The alleged incident that gave rise to the anonymous letter occurred sometime between late November and early December when one of Dr. Hall's students, a third year female medical student, approached Dr. Hall with questions concerning how to correctly interpret a mammogram. However, before the anonymous letter surfaced, rumors were circulating of the alleged incident in Clinic 2, and such rumors led Dr. Carol Scott-Conner, Professor in the Surgery Department, to investigate the rumors by asking the third year female medical student and Dr. Hall about the incident. Dr. Scott-Conner, before the Faculty Grievance Committee, testified that at this time the student told her that she went into Dr. Hall's office to inquire about how to interpret a mammogram and that Dr. Hall, in demonstrating the technique, touched her breast to explain the procedure. The medical student further told Dr. Scott-Conner that "[Dr. Hall] did not to (sic) it with any kind of lascivious intent," but she did feel that what Dr. Hall did was improper. However, Dr. Scott-Conner stated that the student did not voice any desire to take the matter any further.

¶6. When Dr. Scott-Conner questioned Dr. Hall about the matter, Dr. Hall responded that he did not remember any such touching of the student's breast. Dr. Scott-Conner additionally stated that she told Dr. Hall that whether the incident occurred or not that "the way things are now in this society, you can't touch students." Dr. Scott-Conner further testified that she thought that after talking to the medical student and Dr. Hall that nothing further needed to be done and did not even report it to Dr. Robert S. Rhodes, Chairman of the Department of Surgery, because she felt like it was a closed

issue. However, Dr. Rhodes later learned of the episode and questioned Dr. Scott-Conner about her knowledge of the incident, and Dr. Scott-Conner told Dr. Rhodes that she talked to the medical student and Dr. Hall and that she considered the issue closed after doing so.

¶7. Dr. Scott-Conner then stated that her conversation with Dr. Rhodes was the last she heard of it until the anonymous letter surfaced. The anonymous letter alleged that upon being presented with this question that "Dr. Hall grabbed the student's breast with both hands and proceeded to demonstrate the process of mammography by squeezing her breasts in different positions and referring to them as 'tits' as he massaged her breast for several minutes in full view of other employees, nurses and other medical students." The letter additionally stated that "Some of us did go and complain to Dr. Scott-Conner, the Vice-chair of Surgery, and expressed outrage at this inexcusable behavior." The letter concluded with the statement, "The fact that UMC has allowed him to continue to perform in the institution unpunished is evidence that the men who dictate UMC policy are simply colluding with this unacceptable practice. At the very least this should be investigated by an impartial body outside the University." Copies of the anonymous letter were mailed to Chancellor Turner, the Board of Trustees, and Attorney General Mike Moore.

¶8. The anonymous letter was forwarded to the UMC Department of Human Resources for the purpose of investigation in accordance with UMC policy[1] which provides that all written complaints of sexual harassment will be investigated by Campus Police. The Assistant Director for Equal Employment Opportunity ordered the Chief Investigator for the Campus Police to conduct an official investigation of the complaint. A full-scale investigation was conducted and signed statements were taken from the alleged victim; all of the other third year medical students who were assigned rotation in Surgical Clinic 2 at the time of the alleged incident; two of the resident doctors assigned to the Surgery Department; Dr. Carol Scott-Conner; a Registered Nurse in Clinic 2; a Registered Nurse in Ambulatory Services; a nurses aide in Clinic 2; and Dr. Hall. In addition, a telephone conversation was conducted with a doctor no longer at UMC but who was on the block for surgery in Clinic 2 during the time that the alleged incident took place. All of these documents were included and still remain as part of Dr. Hall's personnel file.

¶9. The medical student in her statement to the police stated that the anonymous letter was erroneous. She further stated in reference to Dr. Hall placing his hands on her breast to demonstrate the orientation in which mammograms are taken:

> **Let me say at this point that I was surprised by that act but I did not feel humiliated or was I afraid. I did feel irritated. I really thought of this as an explanation to my question that I asked. I think that Dr. Hall's behavior was inappropriate for a staff member, but I don't think he did it with lecherous intentions.** (emphasis added.)

¶10. Dr. Hall upon being asked by Campus Police to make a statement regarding the anonymous letter stated:

> Regarding this letter, let me say that the only thing that I know is that several months ago an M3 medical student . . . was on my service in Clinic 2 and at that time she asked questions about evaluation of a mammogram. I remember describing the orientation of mammograms to the student and reviewing the mammogram on the x-ray viewing box. That's my full recollection, that's all I remember. There was no lewd conduct, no abnormal behavior other

than the training of the student in the normal fashion.

¶11. After the completion of the investigation conducted by Campus Police, the Department of Human Resources determined and informed Dr. Rhodes that there was no basis to substantiate a finding that UMC's sexual harassment policy had been violated. However, the Department of Human Resources found that Dr. Hall had engaged in inappropriate behavior as a member of the teaching faculty and recommended that he be given a written reprimand and told that "failure to refrain from any conduct or action perceived as sexual harassment or improper conduct could result in his immediate termination."

¶12. The recommendation of the Department of Human Resources was followed by Dr. Rhodes actually issuing a written reprimand and informing Dr. Hall of the consequences of possible immediate termination if any further conduct or action that could be perceived as sexual harassment or improper conduct took place. Dr. Rhodes additionally informed Dr. Hall that

[Y]our effectiveness as a faculty member of this department and at UMC has been seriously, if not totally, compromised. I also do not believe you will be able to achieve the degree of career recognition and/or satisfaction you seek by remaining here at UMC. Thus, I have concluded that both your interests and UMC's interests would be best served by your seeking a position elsewhere.

¶13. Upon receiving this written reprimand, Dr. Hall initiated a faculty grievance in accordance with the Faculty/Staff Handbook and the Procedures of UMC. In his Grievance Report Form, Dr. Hall gave notice of his grievance as to the findings set forth in the reprimand letter including, but not limited, to the following: (1) the finding of "inappropriate" behavior; (2) that this finding was obviously initiated by an anonymous charge that was found to have been unfounded; (3) the proclamation that his services at UMC would be terminated as a result of the findings; and (4) the threat that further conduct would result in immediate termination, although there had been a finding that he had not engaged in conduct which amounted to sexual harassment.

¶14. The first level of the grievance procedure involved Dr. Hall agreeing to an informal discussion, as opposed to a formal written complaint with response in writing, regarding his grievance with Dr. Rhodes acting in his capacity as Chairman of the Department of Surgery. However, when Dr. Rhodes was asked by Dr. Hall to please be prepared to discuss all incidents pertaining to the alleged pattern of inappropriate behavior, Dr. Rhodes responded that he was not aware of all the incidents pertaining to the alleged pattern of inappropriate behavior and refused to discuss the matter. Feeling that the informal meeting was not productive, Dr. Hall then filed a formal complaint with Dr. Rhodes. Dr. Rhodes concurred with the findings of the Department of Human Resources and denied all relief requested by Dr. Hall.

¶15. Dr. Hall next proceeded to the second step of the grievance procedure, a tape recorded meeting with Dr. Helen R. Turner, Associate Dean for Academic Affairs. After reviewing all of the investigation materials provided by the Department of Human Resources, speaking with the medical student, and discussing the grievance with Dr. Hall, Dr. Turner concurred with the actions taken by Dr. Rhodes in issuing the reprimand.

¶16. Still aggrieved, Dr. Hall next took his grievance to the third level of the grievance procedure,

review before the UMC Faculty Grievance Committee, alleging that he had not received due process as a result of the investigation conducted by the Department of Human Resources based on an anonymous charge of alleged sexual harassment and not a formal complaint signed by his accuser. Dr. Hall further alleged that grievous damage had been done to his reputation as a result of the contents that were included in his personnel file. Before the Faculty Grievance Committee, Dr. Hall requested the following relief: (1) the purging of his personnel file of all documents which relate to the alleged sexual harassment incident; (2) a withdrawal of the findings that he engaged in "inappropriate behavior;" and (3) a reversal of the premature decision that his contract shall not be renewed.

¶17. At the beginning of the Faculty Grievance Committee's review, Dr. Roland B. Robertson, Associate Vice-Chancellor for Health Affairs chairing the Faculty Grievance Committee, stated the committee's intended focus of Dr. Hall's grievance was as follows:

> Let's make it clear at this point that those allegations [of sexual harassment] were not proven, and so we are not here to deal with that issue. The issue--and I'd like for the committee members to correct me if they do not agree with this --the issue is appropriateness of conduct, behavior and action. Also, there was an allusion in some statements, about his professional capabilities. We are not here to delve into those, because we don't feel that's a purview of this particular body, and that would be up to the chairman and the medical staff of the hospital, and so forth. So, I am trying to limit this to what has been termed inappropriate behavior, statements, and so forth. So that's what we're trying to get at.

After reviewing the investigative materials included in Dr. Hall's personnel folder and meeting on eight different occasions receiving both written and oral statements, transcribed by a court reporter, to consider Dr. Hall's grievance, the committee recommended to Dr. A. Wallace Conerly, Vice Chancellor for Health Affairs, that Dr. Hall behaved inappropriately while demonstrating positioning of a breast for mammography on the third year female medical student. In reaching its conclusion that a reprimand of Dr. Hall was appropriate, the committee stated:

> All things considered, the committee was left to make a credibility choice between Dr. Hall and . . . a third year female medical student. It is our considered opinion that [the medical student] was truthful when she responded "correct" when asked ". . . so, he demonstrated the positions using your breast?" Thus, it was concluded that inappropriate behavior did occur and therefore, a reprimand of Dr. Terrence Hall by Dr. Robert S. Rhodes was appropriate.

The committee further concluded that it could not recommend the purging of Dr. Hall's personnel record of the investigative files related to the alleged sexual harassment incident because "[p]ersonnel records are kept indefinitely according to UMMC policy and cannot be accessed without the written consent of the employee." Furthermore, the committee, in denying Dr. Hall's request to reverse the decision of the Chair of the Department of Surgery not to renew his contract beyond the current academic year, concluded that "[i]nstitutional policy places faculty employment decisions within the prerogative of the respective department through its Chairman" and, thus, left that decision for the respective department and for the administration of UMC. Dr. Conerly reviewed the record and recommendation of the committee and concurred with its finding that Dr. Hall had conducted himself with inappropriate behavior.

¶18. Dr. Hall next appealed his grievance before the Board of Trustees of State Institutions of Higher Learning (hereinafter "the Board") seeking relief from the adverse decisions throughout the levels of University review. However, the Board refused to provide Dr. Hall any relief and affirmed the decision of the University of Mississippi Medical Center Faculty Grievance Committee.

¶19. Following the Board's adverse decision, Dr. Hall filed a Petition for Writ of Certiorari in the Circuit Court of the First Judicial District of Hinds County appealing the Board's decision. In his petition, Dr. Hall alleged that the Board's affirmance of UMC's conduct was arbitrary and capricious and error as a matter of law, for such conduct violated his constitutionally protected right to substantive due process under both the United States Constitution and the Mississippi Constitution of 1890. The circuit court granted Dr. Hall's request for a Writ of Certiorari. However, after reading the record, considering the briefs submitted by each party, hearing oral arguments, and considering applicable judicial precedent, the circuit court, without a written opinion, denied Dr. Hall the relief requested in his Writ of Certiorari.

¶20. Aggrieved by the circuit court's decision, Dr. Hall appeals to this Court and cites the following issues:

> **I. WHETHER DR. HALL WAS DENIED SUBSTANTIVE DUE PROCESS BY THE UNIVERSITY OF MISSISSIPPI MEDICAL CENTER AND THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING.**
>
> **II. WHETHER THE TRIAL COURT ERRED IN FINDING THAT THE BOARD'S DECISIONS WERE NOT ARBITRARY AND CAPRICIOUS.**

### STANDARD OF REVIEW

¶21. Review by the trial court and this Court of orders of a state agency are limited by the arbitrary and capricious standard. *Mississippi State Tax Comm'n v. Mask*, 667 So. 2d 1313, 1314-15 (Miss. 1995) (citing *Mississippi State Tax Comm'n v. Dyer Inv. Co.*, 507 So. 2d 1287, 1289 (Miss. 1987)) . An appeal of an order of an administrative agency "should be to determine whether or not the order of the administrative agency '(1) was supported by substantial evidence, (2) was arbitrary or capricious, (3) was beyond the power of the administrative agency to make, or (4) violated some statutory or constitutional right of the complaining party.'" *Mask*, 667 So. 2d at 1315 (quoting *Mississippi State Tax Comm'n v. Vicksburg Terminal, Inc.*, 592 So. 2d 959, 961 (Miss. 1991)).

### DISCUSSION OF LAW

> **I. WHETHER DR. HALL WAS DENIED SUBSTANTIVE DUE PROCESS BY THE UNIVERSITY OF MISSISSIPPI MEDICAL CENTER AND THE BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING.**

¶22. Dr. Hall alleges that he has been denied his right to substantive due process under the Fourteenth Amendment of the United States Constitution by the University of Mississippi Medical Center and the Board of Trustees of State Institutions of Higher Learning. Dr. Hall does not allege that he was denied procedural due process by either UMC or the Board. Dr. Hall further contends that his protected liberty interest in his reputation was deprived by UMC and the Board in an

arbitrary and unreasonable manner. Dr. Hall argues that UMC abused its internal procedures in an arbitrary and capricious manner by launching a full-scale investigation based on an anonymous letter alleging conduct of sexual harassment. Dr. Hall additionally contends that he has been denied reasonable non-arbitrary professional judgment in the processing of his grievance. The ultimate relief requested by Dr. Hall is the purging of his personnel file of all documents which relate to the alleged sexual harassment incident, for Dr. Hall does not seek an order of reinstatement to the University of Mississippi Medical Center.

¶23. The Board contends that neither UMC or the Board has acted in an arbitrary or capricious manner. The Board also argues that Dr. Hall's constitutionally protected right to substantive due process has not been violated because Dr. Hall had no protected property interest in his employment at UMC nor a protected liberty interest in his reputation. The Board further contends that Dr. Hall's personnel file should not be purged because it is a confidential file and cannot be accessed without the permission of Dr. Hall.

### A. Substantive Due Process

¶24. The United States Fifth Circuit Court of Appeals has best set forth the conceptual analysis bound up with a claim of substantive due process as follows: "The conceptual essence of 'substantive' due process is the notion that the Due Process Clause--in addition to setting procedural minima for deprivations of life, liberty, or property--bars outright 'certain government actions regardless of the fairness of the procedures used to implement them.'" ***Brennan v. Stewart***, 834 F.2d 1248, 1255 (5th Cir. 1988) (quoting ***Daniels v. Williams***, 474 U.S. 327, 331 (1986)). The Fifth Circuit further noticed that "[t]he Supreme Court has never advanced a rigorous theoretical framework for the classification and analysis of all 'substantive' due process claims, but the interrelated strands of the doctrine are relatively clear." ***Id.***

¶25. The Fifth Circuit recognized the following two strands of the substantive due process doctrine by stating:

> One form of "substantive" due process is the substantive protections in the Bill of Rights that have been "incorporated" into the Fourteenth Amendment to limit the power of the states. While it would be more conceptually elegant to think of these substantive rights as "privileges or immunities of citizens of the United States" rather than as deprivations of liberty or property without due process of law, as a matter of doctrinal history the "selective" incorporation of the Bill of Rights has proceeded under the theory that those substantive rights "implicit in the concept of ordered liberty" (and only those rights) are protected against state intrusion by the Due Process Clause. Another form of "substantive" due process is the judicial ban on laws or actions by government officials that "shock the conscience" and thus fall outside the bounds of legitimate governmental activity.

> The Due Process Clause also requires that the states act only through means appropriately related to legitimate ends. This strand of the "substantive" due process doctrine itself is composed of two parts: rationality limitations and normative limitations on government power. Every law or governmental act must be reasonably related to its end, and thus not "arbitrary." Certain laws or actions are unconstitutional, however, even if rationally related to the state's purposes or ends. One historical manifestation of this normative limitation on state power was

simply to declare certain ends illegitimate. But the modern technique has been to require a "compelling" state interest reflected in laws that are "narrowly drawn to express only the legitimate state interests at stake." This normative limitation, whose requirement of a tight "fit" between means and ends was imported from the "strict scrutiny" approach of modern equal protection law, "is 'strict' in theory but usually 'fatal' in fact."

*Id.* at 1255-56 (citations omitted) (footnotes omitted). The Fifth Circuit set forth the relationship between the two strands as follows: "The strands of 'substantive' due process can be conceptually distinguished but they are intertwined. Every action by government must be rationally related to its end, and ends that 'shock the conscience' or otherwise violate the norms 'implicit in the concept of ordered liberty' are illegitimate." *Id.* at 1256.

¶26. However, in order to recover "under a substantive due process claim, a plaintiff must show that the government's deprivation of a property [or liberty] interest was arbitrary or not reasonably related to a legitimate governmental interest." *Williams v. Texas Tech Univ. Health Sciences Ctr.*, 6 F.3d 290, 294 (5th Cir. 1993) (citing *Brennan*, 834 F.2d at 1255). Thus, analysis under a substantive due process claim is not necessary unless Dr. Hall had a protected property or liberty interest.

### 1. Property Interest

¶27. The United States Supreme Court, in *Board of Regents of State Colleges v. Roth*, set forth the applicable analysis in determining whether non-tenured professors at academic institutions of higher learning have a protected property interest in their continued employment. *[Board of Regents of State Colleges v. Roth](), 408 U.S. 564, 577 (1972)*. In *Roth*, the Supreme Court, with regard to when a property interest is present, stated:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. . . .
>
> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law--rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

*[Roth](), 408 U.S. at 577*.

¶28. In determining that Roth, a non-tenured faculty member, had no protected property interest in being re-employed by the university, the Court relied on Wisconsin state law. *[Id.]() at 566-67*. Substantive state law provided that a university teacher could acquire tenure as a permanent employee only after four years of year-to-year employment, and once having acquired tenure, state law provided that the teacher was entitled to continued employment "during efficiency and good behavior." *[Id.]() at 566*. However, a relatively new teacher was statutorily entitled to nothing beyond his one-year appointment. *[Id.]() at 567*. The Court found that state law placed the decision whether to rehire a non-tenured teacher for another year to the unfettered discretion of university officials. *[Id.]()*

Thus, the Court ultimately concluded that Roth did not have a protected property interest in being re-employed. Therefore, in the instant case, whether Dr. Hall had a protected property interest in being re-employed will depend on Mississippi state law.

¶29. Miss. Code Ann. § 37-101-15 provides the Board of Trustees of State Institutions of Higher Learning with the following power and duty:

> The board shall have the power and authority to elect the heads of the various institutions of higher learning and to contract with all deans, professors, and other members of the teaching staff, and all administrative employees of said institutions for a term of not exceeding four (4) years. The board shall have the power and authority to terminate any such contract at any time for malfeasance, inefficiency, or contumacious conduct, but never for political reasons. It shall be the policy of the board to permit the executive head of each institution to nominate for election by the board all subordinate employees of the institution over which he presides. It shall be the policy of the board to elect all officials for a definite tenure of service and to reelect during the period of satisfactory service. The board shall have the power to make any adjustments it thinks necessary between the various departments and schools of any institution or between the different institutions.

Miss. Code Ann. § 37-101-15(f) (1996).

¶30. Miss. Code Ann. § 37-101-15(f) and its effect on university professors' employment status was discussed by this Court in *Wicks v. Mississippi Valley State University*, 536 So. 2d 20 (Miss. 1988). In *Wicks*, this Court held that a non-tenured professor did not have a protected property interest in his employment because the Board of Trustees of State Institutions of Higher Learning had the authority to terminate professors' employment contracts at any time for malfeasance, inefficiency or contumacious conduct. *Wicks*, 536 So. 2d at 23. The Court held that Miss. Code Ann. § 37-101-15(f) did "not create a legitimate expectation of continued employment for a non-tenured employee." *Id.* (citing *Montgomery v. Boshears*, 698 F.2d 739 (5th Cir. 1983)). The Court concluded that since Wicks' "expectation of tenure [was] not legitimate, then his expectation [did] not merit substantive protection under the due process clause." *Id.* (citing *Bishop v. Wood*, 426 U.S. 341 (1976); *Wood v. Strickland*, 420 U.S. 308 (1975)).

¶31. Analogously, in the case sub judice, Dr. Hall was in his fourth year of employment as a professor at UMC and had not been granted tenure by the faculty or Board. Therefore, Dr. Hall did not have a legitimate expectation of, nor entitlement to, continued employment at UMC, and furthermore, the renewal of Dr. Hall's contract was subject to approval of the Board. As such, we hold that Dr. Hall did not have a protected property interest in his employment at UMC, and thus, he is not entitled to substantive protection under the due process clause as the result of the arbitrary deprivation by government action of a protected property interest.

### 2. Liberty Interest

¶32. Analogous to a substantive due process protection against the deprivation of a protected property interest by arbitrary government action, an individual is afforded substantive due process protection against arbitrary governmental deprivation of a protected liberty interest. The asserted liberty interest in the case sub judice is that Dr. Hall possessed a protected liberty interest in his

reputation such that he could not be discharged in such a manner that imposes a stigma on him and forecloses future employment opportunities.

¶33. The United States Supreme Court has held that an individual does not have a protected liberty interest in his reputation alone by stating false the proposition that "reputation alone, apart from some more tangible interests such as employment, is either 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause." *Paul v. Davis*, 424 U.S. 693, 701 (1976). However, the Court, in *Roth*, stated that "[t]here might be cases in which a State refused to re-employ a person under such circumstances that interests in liberty would be implicated." *Roth*, 408 U.S. at 573. In concluding that Roth did not have any liberty interest implicated by the university declining to rehire him, the Court stated that his liberty interest could possibly be implicated in the following scenario:

> The State, in declining to rehire the respondent, did not make any charge against him that might seriously damage his standing and associations in his community. It did not base the nonrenewal of his contract on a charge, for example, that he had been guilty of dishonesty, or immorality. Had it done so, this would be a different case. *For '[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential.'* In such a case, due process would accord an opportunity to refute the charge before University officials. In the present case, however, there is no suggestion whatever that the respondent's 'good name, reputation, honor, or integrity' is at stake.

> Similarly, there is no suggestion that the State, in declining to re-employ the respondent, imposed on him a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities.

*Id.* (emphasis added) (citations omitted) (footnote omitted). Thus, it is not clear whether the United States Supreme Court has afforded a public employee a protected liberty interest in his reputation, but it would appear certain from the discussion in *Roth* that where a public employee is dismissed in such an arbitrary and capricious manner that in doing so the government action *"impose[s] on him a stigma or other disability that foreclose[s] his freedom to take advantage of other employment opportunities,"* within his chosen profession, such individual would suffer a deprivation of liberty. *Id.* (emphasis added).

*¶34.* The United States Supreme Court has stated that where an employee is dismissed from employment in such an arbitrary and capricious manner that the dismissal places a "stigma" on his reputation and endangers his ability to seek other employment, there has occurred a deprivation of his liberty. *See Paul v. Davis*, 424 U.S. 693, 701, 705-06 (1976). In *Paul*, Davis, after being dismissed of a charge of shoplifting, brought a 42 U.S.C. § 1983 claim against the petitioner police chiefs alleging that the petitioner police chiefs had violated his constitutionally protected liberty interest in his reputation under color of law by distributing his photograph and name in a flier entitled "Active Shoplifters" to local store owners. *Paul*, 424 U.S. at 696-97. The Supreme Court, in rejecting Davis' claim that his constitutionally protected liberty interest in his reputation had been violated, held that an individual does not have a protected liberty interest in his reputation alone. *Id.* at 711-12. However, in recognizing that there may be circumstances where harm by government action to an

individual's reputation would amount to a deprivation of liberty, the Supreme Court stated:

> While we have in a number of our prior cases pointed out the frequently drastic effect of the "stigma" which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, *apart from some more tangible interests such as employment*, is either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause.

*Id.* at 701 (emphasis added). In holding that this was not the situation in *Paul*, the Supreme Court stated,"'Finally, it is to be noted that this is not a case where government action has operated to bestow a badge of disloyalty or infamy, with an attendant foreclosure from other employment opportunity.'" *Id.* at 705 (quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 898 (1961) (citing *Wieman v. Updegraff*, 344 U.S. 183, 190-91 (1952); *Joint AntiFacist Refugee Comm. v. McGrath*, 341 U.S. 123, 140-41 (1951))). Thus, where arbitrary and capricious government action results in damage to a public employee's reputation such as to foreclose the employee's future employment opportunities there may be a deprivation of liberty.

¶35. In addition, this Court has held that "[t]he existence of a property interest is determined by constitutional law." *Wicks*, 536 So. 2d at 22. "Article 3 § 14 of the Mississippi Constitution provides that 'No person shall be deprived of life, liberty, or property except by due process of law.'" *Id.* While the existence of a property interest can be created by state law, either legislatively or judicially, likewise, the existence of a protected liberty interest in an individual's reputation can be created by this Court. Thus, we create a protected liberty interest in a public employee's reputation where the following circumstances occur: (1) the alleged injury occurred in either a discharge or re-hiring process of a public employee; (2) the alleged injury is related to one's reputation; and (3) the injury to the employee's reputation is coupled with an interest in other employment opportunities that will be foreclosed as the result of arbitrary and capricious governmental action.

### B. Substantive Due Process Analysis

¶36. Having set forth the theoretical framework of a substantive due process analysis and determined that an individual may suffer a deprivation, by arbitrary and capricious governmental action, of his or her protected liberty interest in his or her reputation where such governmental action forecloses that individual's employment opportunities, the question remains as to when such a deprivation of liberty occurs by arbitrary and capricious governmental action. The issue of the appropriate substantive due process analysis to be applied where an employee claims a deprivation of a liberty interest in violation of his substantive due process rights is one of first impression before this Court.

¶37. Today, we find persuasive the following analysis, formulated by the United States District Court for the Northern District of Mississippi in *Ishee v. Moss*, 668 F. Supp. 554 (N.D. Miss. 1987), for determining whether deprivation of a liberty interest has occurred. In *Ishee v. Moss*, the federal district court formulated the following three part analysis for determining whether there has been deprivation of a liberty interest:

> A constitutionally protected liberty interest is implicated only if an employee is discharged in a manner that creates a false and defamatory impression which stigmatizes and forecloses him from other employment opportunities. [*White v. Thomas*, 660 F.2d 680, 684 (5th Cir. 1981)];

*Codd v. Velger*, 429 U.S. 624, 628 . . . (1977). Moreover, for a charge to be stigmatizing, it must be worse than merely adverse; it must be such as to give rise to a "badge of infamy, public scorn, or the like." [*Wells v. Hico Indep. Sch. Dist*., 736 F.2d 243, 256 n.16 (5th Cir. 1984)] (and cases cited therein). Finally, the employee must show that the governmental agency has made the stigmatizing charges public in any official or intentional manner, other than in connection with the defense of related legal action. *Wells*, 736 F.2d at 256; *Ortwein v. Mackey*, 511 F.2d 696, 699 (5th Cir. 1975). In summary, to support a claim of deprivation of a liberty interest, a plaintiff must show (1) that he has been stigmatized, (2) in or as a result of the "discharge" process, and (3) that the stigmatization resulted from charges made public by his employer. [*Kelleher v. Flawn*, 761 F.2d 1079, 1087 (5th Cir. 1985)]; *Wells v. Doland*, 711 F.2d 670, 676 (5th Cir. 1983).

*Ishee*, 668 F. Supp. at 558. Application of this analysis to the case sub judice shows that Dr. Hall's substantive due process rights were not violated nor was he deprived of his protected liberty interest in his reputation.

¶38. In order to prove an implication of his constitutionally protected liberty interest, Dr. Hall must first show that he has been "discharged in a manner that creates a false and defamatory impression which stigmatizes and forecloses him from other employment opportunities." *Id.* The event that ultimately led to the discharge of Dr. Hall was the finding by UMC that Dr. Hall had conducted himself inappropriately and that it was in the better interest of UMC to not renew his contract. It is Dr. Hall's contention that this finding should have never been made because it was arbitrary governmental action for UMC to investigate the anonymous complaint of sexual harassment filed against Dr. Hall. Dr. Hall further contends that the scope of the investigation was too broad and that the inclusion into his personnel file of all investigatory materials and refusal at each level of the grievance procedure to remove the materials from his personnel file continues to harm his reputation and other employment opportunities.

¶39. Dr. Hall's personnel file contains statements made in connection with the investigation that amount to nothing more than free reign being given to students and co-workers to express their opinions about Dr. Hall's professional conduct which in no way were connected to the anonymous complaint of sexual harassment made against Dr. Hall. As a result, we find that the continued inclusion within Dr. Hall's personnel file of all the raw investigatory materials as the result of the investigation into the complaint of sexual harassment made against Dr. Hall did result in the discharge of Dr. Hall "in a manner that creates a false and defamatory impression which stigmatizes and forecloses him from other employment opportunities," and thus, Dr. Hall satisfies the first part of the *Ishee* analysis. *Id.*

¶40. Next, Dr. Hall is required to prove the second element of the *Ishee* analysis which requires that "for a charge to be stigmatizing, it must be worse than merely adverse; it must be such as to give rise to a 'badge of infamy, public scorn, or the like.'" *Id.* (quoting *Wells*, 736 F.2d at 256 n.16). Dr. Hall's future employment opportunities are continuously harmed by the contents of his personnel file to the effect of attaching a stigma to Dr. Hall's reputation amounting to the level of a badge of infamy, i.e., that for another institution to employ Dr. Hall they will run the risk of having a sexual harassment charge filed against the respective institution. In today's society with the already existing hysteria for employers to be subjected to liability for a charge of sexual harassment by one of its employees,

UMC's actions and the Board's actions of allowing all materials of the investigation which resulted in no finding of sexual harassment to remain in Dr. Hall's personnel file wrongly attaches to Dr. Hall's reputation the stigma of being a potential sexual harasser. Thus, the effect of UMC's and the Board's actions amount to more than being merely adverse, but, instead, their actions place a stigma on Dr. Hall that rises to the level of a "badge of infamy" which forecloses his ability to pursue other employment opportunities. As a result, Dr. Hall satisfies the second element of the *Ishee* analysis.

¶41. Finally, in order to be afforded any relief Dr. Hall "must show that the governmental agency has made the stigmatizing charges public in any official or intentional manner, other than in connection with the defense of related legal action." *Id.* The federal district court, in *Ishee*, with regard to the contents of a confidential file after an investigation, stated:

> Disclosure within an agency may implicate a liberty interest if the disclosure is gratuitously made to persons with no responsibility for or interest in the matter disclosed. *Ventetuolo v. Burke*, 470 F. Supp. 887, 896 (D.R.I. 1978). Here no such gratuitous disclosures have been shown. All disclosures mentioned in the pleadings, evidence at the hearing on the preliminary injunction, briefs following that hearing, and memorandum in the present motion for summary judgment have been those made in connection with the investigation into the charges. Clearly, the agency must have the right to investigate charges against its employees and must have immunity in the reasonable investigation of these charges. Nor does the presence of the derogatory information in the confidential file implicate a liberty interest absent a showing that the employer has made or is likely to make the disclosure public in an official or intentional manner. *Wells*, 736 F.2d at 258 n.20; *Kelleher*, 761 F.2d at 1087; *Sims v. Fox*, 505 F.2d 857, 864 (5th Cir. 1974) . . . .

*Ishee*, 668 F. Supp. at 559. The district court, in granting summary judgment, concluded that Ishee failed to meet his burden of showing that the charges contained in the confidential file ever became public by stating that "[t]here is no evidence the general public or employees other than those questioned in connection with the investigation ever became aware of the reason for termination." *Id.*

¶42. Likewise, Dr. Hall has not put forth any evidence that "the general public or employees other than those questioned in connection with the investigation ever became aware of the reason for termination." *Id.* Although, Dr. Hall's personnel file contains investigatory materials that, if released to the general public, could result in the implication of Dr. Hall's constitutionally protected interest in his reputation, the materials have been retained in Dr. Hall's personnel file which can only be accessed with the permission of Dr. Hall, and furthermore, there is no evidence that the contents of the file have been made available to the general public. However, Dr. Hall contends that the materials will be disclosed publicly in an official manner when he is required to release permission for his personnel file to be viewed by a future potential employer. We cannot conclude that this future contingent publication is sufficient to satisfy the publication requirement in *Ishee* to prove implication of Dr. Hall's protected liberty interest.

¶43. As a result, Dr. Hall has failed to satisfy his burden of proof under this third part of the *Ishee* analysis by failing to show that the false and defamatory materials contained in his personnel file have been or will be made public in an official or intentional manner. We hold that Dr. Hall has not shown that he was deprived of his constitutionally protected liberty interest in his reputation, and thus, there

has been no violation of Dr. Hall's substantive due process rights.

## II. WHETHER THE TRIAL COURT ERRED IN FINDING THAT THE BOARD'S DECISIONS WERE NOT ARBITRARY AND CAPRICIOUS.

¶44. Although Dr. Hall fails to prove that there has been a violation of his substantive due process rights by failing to satisfy the publication requirement, the Board's decision still has to be reviewed under our traditional arbitrary and capricious standard of review for decisions by administrative agencies. *See Mississippi State Tax Comm'n v. Mask*, 667 So. 2d 1313, 1314-15 (Miss. 1995) (citing *Mississippi State Tax Comm'n v. Dyer Inv. Co.*, 507 So. 2d 1287, 1289 (Miss. 1987)). Where a decision of an administrative agency is appealed to the circuit court pursuant to a writ of certiorari as provided by Miss. Code Ann. § 11-51-93, the circuit court's review of the decision of state agencies is to "be confined to the examination of questions of law arising or appearing on the face of the record and proceedings." Miss. Code Ann. § 11-51-93 (1972). This Court's decision in *Gill v. Mississippi Department of Wildlife Conservation* sets forth the appropriate analysis for reviewing the Board's decision on a writ of certiorari under section 11-51-93 as follows:

> At first blush this would seem to pretermit any review of the facts and even our normal inquiry whether there may be substantial evidence to support the decision of the [administrative agency]. On the other hand, should the record and proceedings below reflect a decision wholly unsupported by any credible evidence, we would regard that decision as contrary to law and, as a matter appearing on the face of the record or proceedings, subject to modification or reversal. We thus are in our familiar posture of judicial review of administrative processes wherein we may interfere only where the board or agency's decision is arbitrary and capricious, accepting in principle the notion that a decision unsupported by any evidence is by definition arbitrary and capricious.

*Gill v. Mississippi Dep't of Wildlife Conservation*, 574 So. 2d 586, 591(Miss. 1990). Thus, we will find the Board's decision was arbitrary and capricious only where it is unsupported by any evidence. *Gill*, 574 So. 2d at 591.

¶45. After receiving the anonymous complaint of sexual harassment against Dr. Hall, the Department of Human Resources at UMC initiated an investigation by campus police into the anonymous complaint, concluded that although the results of the investigation did not support a finding that UMC's sexual harassment policy had been violated, the results of the investigation did support a lesser finding of inappropriate behavior by Dr. Hall, and recommended that Dr. Hall be given a formal written reprimand. Dr. Hall subsequently received a written reprimand by Dr. Rhodes, the respective department chairman. Dr. Hall then filed a grievance in accordance with UMC's internal grievance procedure, and this decision was affirmed at all levels of the grievance procedure including review by the Faculty Grievance Committee and the Board.

¶46. The Faculty Grievance Committee affirmed the decision to issue a formal written reprimand to Dr. Hall based on its conclusion that the evidence presented a credibility call between Dr. Hall and the female medical student and that the medical student was truthful when she responded affirmatively to inquiry whether Dr. Hall had touched her breast while demonstrating how to perform a mammogram. The medical student consistently testified throughout this matter that she believed that Dr. Hall's actions were inappropriate but that she did not feel humiliated or afraid nor did she feel

that Dr. Hall acted with lecherous intentions. Thus, we find that the decision of the Board to affirm the finding of inappropriate behavior and issue a written reprimand was not an arbitrary and capricious decision because it was supported by the medical student's testimony.

¶47. Dr. Hall, however, contends that it was arbitrary and capricious action for UMC to even investigate the anonymous complaint because UMC policy required that all complaints of sexual harassment must be in writing. Dr. Hall argues that although the complaint was in writing that because it was not signed by an identified individual, the complaint should not have been investigated. However, we do not believe it was arbitrary and capricious action by UMC to investigate the anonymous complaint of sexual harassment because of the seriousness of the charge and the potential liability that UMC could face if it failed to investigate the charge and such claim was later found to be meritorious. *See Stockley v. AT & T Info. Sys., Inc.*, 687 F. Supp. 764, 768 (E.D.N.Y. 1988) (holding that employer's decision to initiate investigation of anonymous letter was proper where the letter provided reasonable grounds that sexual harassment may have been committed and investigation was required under Title VII). However, in the future, it would be more appropriate for UMC to consider following the guidance issued in 1997 by the Department of Education entitled Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties which sets forth a balancing test of when to investigate anonymous complaints of sexual harassment. The Guidance provides that anonymous complaints of sexual harassment should be investigated if review of the following factors deems it reasonable for the school to investigate: "the source and nature of the information; the seriousness of the alleged incident; the specificity of the information; the objectivity and credibility of the source of the report; whether any individuals can be identified who were subjected to the alleged harassment; and whether those individuals want to pursue the matter." Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 Fed. Reg. 12,034, 12,044 (1997).

¶48. Dr. Hall further contends that the scope of UMC's investigation into the anonymous complaint was arbitrary and capricious. Dr. Hall argues that it was unreasonable for UMC to continue its investigation after the medical student indicated that she did not feel like Dr. Hall's conduct was done with lecherous intentions. However, we are of the opinion that UMC's investigation of the matter was not unreasonable and further that UMC was required to investigate the incident. After all, the student also stated that Dr. Hall's actions were "inappropriate for a staff member," which was the ultimate finding against Dr. Hall. To place such tight restraints on UMC as to how to investigate charges of sexual harassment would effectively place UMC on the fine line of a razor's edge, and we are not compelled to place such restraints on UMC which might subject it to liability for failing to prevent sexual harassment if it does not investigate the complaint and the complaint later be proven meritorious or to hold it liable if it oversteps the proper bounds of an investigation. *See McDonnell v. Cisneros*, 84 F.3d 256, 261 (7th Cir. 1996) (refusing to hold employer liable for sexual harassment where investigation was overbroad because to do so would place employer's decision to investigate on a razor's edge).

¶49. Finally, Dr. Hall contends that it was arbitrary and capricious for UMC to include all of the materials from the investigation within his personnel file, thus harming his ability to obtain future gainful employment. The Board and UMC have asserted that it is UMC's policy to include the investigatory materials in an employee's personnel file and further contend that they are mandated by federal guidelines to include these materials in Dr. Hall's personnel file. However, neither the Board

nor UMC provided this Court with the stated policy or provided federal regulations within this record, that require the placement of the investigatory materials in Dr. Hall's personnel file. We are of the opinion that the Board's and UMC's decision to keep these materials in Dr. Hall's personnel file was arbitrary and capricious and that these materials should not remain in Dr. Hall's personnel file. Instead, they should be returned to and stored in the confidential investigation file maintained by campus police who conducted the investigation.

¶50. In ***Robinson v. Jacksonville Shipyards, Inc.***, the United States District Court for the Middle District of Florida enjoined Jacksonville Shipyards to adopt, implement, and enforce a policy and procedures for the prevention and control of sexual harassment. ***Robinson v. Jacksonville Shipyards, Inc.***, 760 F. Supp. 1486, 1537 (M.D. Fla. 1991). In ***Robinson***, the policy that the federal district court ordered to be implemented provided that an employee's personnel file would only include a statement regarding "the conduct, or alleged conduct, and the warning given, or other discipline imposed." ***Robinson***, 760 F. Supp. at 1543. Likewise, we hold that UMC is required to place in the personnel file of Dr. Hall only a statement regarding the conduct, the findings of the investigation, and a statement regarding the disciplinary action taken against Dr. Hall.

¶51. As a result, we find that the trial court did not err in finding the Board's actions were not arbitrary and capricious with the exception of the Board's decision to retain in Dr. Hall's personnel file all of the investigatory materials from UMC's investigation which was arbitrary and capricious.

## CONCLUSION

¶52. Thus, we find that an individual does have a constitutionally protected liberty interest in his reputation that may be deprived by arbitrary and capricious government action where the employee is discharged in such a manner that stigmatizes his reputation and forecloses future employment opportunities and adopt the three part analysis set forth in ***Ishee v. Moss*** for determining when there has been a deprivation of that constitutionally protected liberty interest. However, we find that Dr. Hall's substantive due process rights were not violated, for he has failed to sufficiently provide evidence satisfying the third part of the ***Ishee*** analysis regarding publication of the stigmatizing charges.

¶53. We also find that the Board's and UMC's conclusion that Dr. Hall's conduct was inappropriate and the discipline imposed on Dr. Hall was not an arbitrary and capricious action. Further, we find that the Board's decision to affirm UMC's conduct of investigating the anonymous complaint of sexual harassment, and the method of investigation chosen, was not arbitrary and capricious. However, we do find that the Board's decision to retain in Dr. Hall's personnel file all of the investigatory materials as the appropriate place to retain the materials was arbitrary and capricious. These materials should be removed from Dr. Hall's personnel file and returned to campus police who conducted the investigation and maintained as UMC deems appropriate. Only a statement regarding the alleged conduct, the findings of the investigation, and the discipline imposed on Dr. Hall should be contained in his personnel file.

**¶54. AFFIRMED IN PART; REVERSED AND RENDERED IN PART FOR PROCEEDINGS CONSISTENT WITH THIS OPINION.**

**PRATHER, C.J., ROBERTS, MILLS AND WALLER, JJ., CONCUR. McRAE, J., CONCURS**

**IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION JOINED BY SULLIVAN AND PITTMAN, P.JJ. BANKS, J., NOT PARTICIPATING.**

**McRAE, JUSTICE, CONCURRING IN PART AND DISSENTING IN PART:**

¶55. The majority correctly finds that Dr. Hall suffered no deprivation of his constitutional rights from the University of Mississippi Medical School's inquiry into anonymous allegations of sexual harassment brought against him. However, the opinion goes too far in ordering the investigatory materials to be removed from his personnel files and placed in a confidential UMC campus police file. It further goes beyond the scope of the relief sought in directing the school to follow certain policies and procedures in the investigation and maintenance of records in sexual harassment complaints. Accordingly, I dissent.

¶56. Anonymous allegations of sexual harassment, as the majority points out, warrant investigation just as do those that have been signed because of the serious nature of such charges and the employer's potential liability. *Stockley v. AT &T Information Systems, Inc.,* 687 F. Supp. 764, 769 (E.D.N.Y. 1988). In the legal profession, anonymous complaints against attorneys and judges are treated with the same seriousness as those where the complainant has identified himself. There is no reason why members of the medical and academic communities should be held to a lesser standard. The majority, therefore, goes a step too far in allowing Dr. Hall's personnel file to be cleansed of all investigatory material.

¶57. The majority exceeds the scope of our authority in suggesting that the Medical School, in the future, should follow the sexual harassment guidelines issued by the United States Department of Education in 1997. It is not our prerogative to dictate the school's policies or procedures, whether the subject matter at issue is the investigation of complaints of sexual harassment made against faculty members or a determination of what classes students are required to take. Rather, it is within the ambit of the Legislature, since the school is a State institution, or of an accrediting organization or agency such as the American Medical Association, to issue such a directive. By the same token, the majority has overstepped its boundaries in its "holding" that "UMC is required to place in the personnel file of Dr. Hall only a statement regarding the conduct, the findings of the investigation, and a statement regarding the disciplinary action taken against Dr. Hall," based on the Florida District Court's mandate in *Robinson v. Jacksonville Shipyards, Inc.,* 760 F. Supp. 1486, 1537 (M.D. Fla. 1991). In that case, as distinguished from the case *sub judice*, the plaintiff sought injunctive relief in the form of the employer's adoption and enforcement of policies and procedures to prevent sexual harassment. Dr. Hall sought no such injunctive relief and it is, therefore, not within our purview to revise the school's policies.

¶58. Because I disagree with the majority's decision that Dr. Hall's files should be cleansed and with its attempts, beyond our scope of authority, to revamp UMC's policies, I respectfully dissent.

**SULLIVAN AND PITTMAN, P.JJ., JOIN THIS OPINION.**

1. UMC's policy regarding complaints of sexual harassment and the investigation thereof is set out in the Faculty and Staff Handbook as follows:

> Any complaint by a UMC student or employee of sexual harassment must be reported immediately to the Director of Human Resources or the Assistant Director for Equal Employment Opportunity. All complaints must be in writing and will be investigated by Campus Police. The employee also may follow the Medical Center's grievance procedure and may go directly to step three of the procedure if the complaint is against the person to whom a grievance is presented at step one or two. In all cases, Human Resources will take disciplinary action up to and including termination. This rule applies equally to sexual harassment of both men and women.