## IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1999-CA-01126-SCT

*UNIVERSITY OF MISSISSIPPI MEDICAL CENTER, THE STATE OF MISSISSIPPI AND BOARD OF TRUSTEES OF STATE INSTITUTIONS OF HIGHER LEARNING*

*v.*

*CHRISTOPHER W. HUGHES AND ERIC BEASLEY*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/02/1999 |
| TRIAL JUDGE: | HON. DENISE OWENS |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | OFFICE OF THE ATTORNEY GENERAL |
| | BY:  ED DAVIS NOBLE, JR. |
| | ROBERT G. JENKINS |
| | CHARLES T. RUBISOFF |
| ATTORNEYS FOR APPELLEES: | MICHAEL L. KNAPP |
| | MARC E. BRAND |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | REVERSED AND RENDERED-08/24/2000 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 9/15/2000 |

**BEFORE PRATHER, C.J., SMITH AND DIAZ, JJ.**

**SMITH, JUSTICE, FOR THE COURT:**

### STATEMENT OF THE CASE

¶1. Christopher W. Hughes and Eric Beasley, former medical students at the University of Mississippi Medical Center ("the University"), failed to pass Step One of the United States Medical Licensing Examination ("USMLE"). University guidelines state that if a student does not pass this examination in three attempts, the student will be dismissed from medical school. Pursuant to these guidelines, Hughes and Beasley were dismissed from the University. Hughes brought the present action for an injunction in the Hinds County Chancery Court, and Beasley intervened as a plaintiff. Chancellor Denise Owens ordered the University to readmit Hughes and Beasley so that they might afforded one more opportunity to take the examination. The University appeals this determination.

### STATEMENT OF FACTS

¶2. Christopher W. Hughes enrolled in the School of Medicine at UMMC in 1992. At that time, according to the academic guidelines of the School of Medicine, in order to proceed in medical school and ultimately

to receive a doctor of medicine degree from the University, a student had to maintain an overall average of 75. At the time Hughes enrolled in medical school in 1992, the Federation of State Medical Boards and the National Board of Medical Examiners required a student to pass the USMLE in order to be licensed. In 1992, the USMLE was not a requirement for promotion in the School of Medicine or for receipt of the doctor of medicine degree.

¶3. The USMLE is given in three parts, known as Step 1, Step 2, and Step 3. In September 1993, when Hughes was beginning his sophomore year, the Executive Faculty of the School of Medicine met to consider the recommendation of the Curriculum Committee that the USMLE Step 1 be required for promotion to the junior year. This is a requirement set by the majority of medical schools nationwide. The Executive Faculty passed the recommendation unanimously on September 28, 1993.

¶4. Dr. Lincoln Arceneaux, associate dean of student affairs for the School of Medicine, testified regarding the basis for this decision. He explained that the Federation of State Medical Boards and the National Board of Medical Examiners require a student to pass the USMLE to become licensed. The State Board of Medical Licensure requires that in order to begin residency training in Mississippi, a student must have passed Step 1 and Step 2 of the USMLE and must have received the doctor of medicine degree. Dr. Arceneaux stated that the School of Medicine adopted the requirement that a student pass Step 1 for promotion to the junior year and the requirement that a student pass Step 2 prior to certification for the M.D. degree so an individual who received an M.D. degree from UMC would be qualified for entry into residency training in Mississippi. The requirement went into effect in June 1994.

¶5. On September 29, 1993, Dr. Arceneaux wrote a memorandum to sophomore students explaining the change in requirements. The memo stated:

> Following action by the Executive Faculty of the University of Mississippi School of Medicine on September 28, 1993, sophomore medical students 1993-94 are required to take the USMLE Step I in June, 1994 and pass this examination as an additional requirement for promotion to the junior medical year.

> Sophomore medical students 1993-94 who have fulfilled all other requirements for promotion, but who fail the June, 1994 USMLE Step I, may be allowed to enroll on a contingent basis for the first junior medical block beginning August/September, 1994; however, such a student will be required to repeat and pass the Step I examination in September, 1994 in order to continue with the junior year in 1994-95. Any such student who fails the repeat USMLE Step I in September, 1994 must repeat and pass the Step I examination in June, 1995 in order to be promoted to the M-3 year for 1995-96.

¶6. Upon completion of his sophomore year, Hughes failed to pass both the June 1994 Step 1 examination as well as the September 1994 Step 1 examination. After Hughes failed his second attempt at the examination, the Executive Faculty recommended that he either undertake a self-study program, with Step 1 in June 1995 serving as the final exam for the self-study program or, alternatively, that Hughes be placed on a leave of absence until the June 1995 exam. Hughes chose to participate in the self-study program. On March 29, 1995, Dr. Arceneaux sent another memorandum to all medical students which included the requirement passed by the Executive Faculty. It stated as follows:

> On March 28, 1995, the Executive Faculty of the University of Mississippi School of Medicine approved the updated Standards for Scholastic Performance as shown in bold print below:

STANDARDS FOR SCHOLASTIC PERFORMANCE - To be eligible for promotion, a student must achieve a grade of not less than 70.0 in each course, have no grade with an F designation which indicates a deficiency in a specific portion of a course, and have a weighted average of 75.0 or higher. Sophomore students must also pass Step 1 of the United States Medical Licensing Examination (USMLE) to be eligible for promotion to the junior year. Senior students must also have passed USMLE Step 2 to be eligible for graduation.

*****

Sophomore students, satisfactorily completing all course work for the second (M2) year may begin the junior year on a contingent basis pending receipt of the results of their USMLE Step 1. Students who fail the Step 1 examination may not continue with the junior year nor receive credit for any junior course work already begun; such students will be placed on leave of absence for a period not to exceed one year during which they must pass the USMLE Step 1. Students who pass the Step 1 examination during this period qualify for promotion to the junior year; those who have not passed will be dismissed from the School of Medicine.

*****

¶7. Hughes did not pass the June 1995, Step 1 examination, his third attempt. Hughes was notified of his dismissal from medical school by letter dated August 9, 1995. He appealed his dismissal in September 1995 to the Executive Faculty, and his dismissal was sustained. Dr. Arceneaux testified that Hughes would have been promoted to his junior year if he had passed Step 1, despite the fact that his course grades were marginal.[1] Dr. Arceneaux also stated that the USMLE composite committee recommends that a student be allowed to take the examination up to six times.

¶8. Hughes filed a Complaint for Injunction and Other Relief against UMC and the Board of Trustees of State Institutions of Higher Learning (hereinafter collectively referred to as "the University") in the Chancery Court of Hinds County , First Judicial District, on June 19, 1996. Hughes did not request damages. Hughes asserted that the action taken by the University constituted a breach of contract and violated both his due process and equal protection rights.

¶9. Following to a bench trial, the chancellor found that Hughes had a vested contract with the University and that in changing the standards required to maintain Hughes' medical course, the University acted in an arbitrary and capricious manner. On April 11, 1997, the chancellor ordered the University "to clear Mr. Hughes so that he can sit for the USMLE Step I test at the next available sitting." Hughes filed a Motion for Clarification on July 1, 1997.

¶10. On October 28, 1997, Eric Beasley filed a Motion to Intervene in the action. In his petition, Beasley stated that he, like Hughes, was admitted to UMC in 1992. He repeated his freshman year and completed his sophomore year in 1995. Beasley, like Hughes, failed the USMLE Step 1 three times. The chancellor granted Beasley's Motion to Intervene on December 24, 1997. Such are all the facts in the record regarding Beasley. Beasley has not filed a brief for purposes of this appeal. Beasley urged the chancery court that his claim is identical to that of Hughes. Thus, for simplicity's sake, Hughes and Beasley will hereafter be referred collectively to as "Hughes."

¶11. The chancellor held a hearing on the Motion for Clarification on May 12, 1999. At the hearing, the

testimony showed that, in order to qualify to take the USMLE, a student must be officially enrolled in a medical school. The chancellor entered judgment on June 4, 1999, and ordered the School of Medicine to readmit Hughes and Beasley, commencing in June 1999, so that they might satisfy the enrollment requirement for sitting for the USMLE for the purpose of affording them one additional opportunity to take the examination. The chancellor stated that the University's requirements for progressing to the junior year shall not be disturbed.

¶12. The University filed a motion for stay of the chancery court's judgment and supersedeas pending appeal on June 16, 1999. Because notice of the final judgment of the court to UMC was delayed until June 16, 1999, the chancery court granted the motion for stay and supersedeas. The University filed a notice of appeal on June 24, 1999. The University raises the following issues:

> **I. WHETHER THE CHANCERY COURT ERRED IN DETERMINING THAT THE PLAINTIFFS ESTABLISHED A CONSTITUTIONALLY PROTECTED INTEREST IN A CONTINUED STATUS AS STUDENTS IN GOOD STANDING.**

> **II. WHETHER THE CHANCERY COURT ERRED IN DETERMINING THAT THE PLAINTIFFS WERE TREATED DIFFERENTLY THAN OTHER MEMBERS OF THEIR CLASS BY THE ACTION COMPLAINED OF.**

## STANDARD OF REVIEW

¶13. This case involves no dispute of fact. For questions of law, this Court conducts a de novo review of a chancellor's decision. *Consolidated Pipe & Supply Co. v. Colter*, 735 So. 2d 958, 961 (Miss. 1999) (citing *Harrison County v. City of Gulfport*, 557 So. 2d 780, 784 (Miss.1990); *Cole v. National Life Ins. Co.*, 549 So. 2d 1301, 1303 (Miss.1989)). The dispute at hand arises in an academic context where judicial intervention in any form should be undertaken only with the greatest reluctance. *Regents v. Ewing*, 474 U.S. 214, 226, 106 S.Ct. 507, 514, 88 L.Ed.2d 523 (1985) (declaring courts unsuited "to evaluate the substance of the multitude of academic decisions that are made daily by faculty members of public educational institutions"). This is the case especially regarding degree requirements in the health care field when the conferral of a degree places the school's imprimatur upon the student as qualified to pursue his chosen profession. *Jansen v. Emory Univ.*, 440 F. Supp. 1060, 1062-63 (N.D. Ga. 1977), *aff'd*, 579 F.2d 45 (5th Cir. 1978).

## DISCUSSION OF LAW

> **I. WHETHER THE CHANCERY COURT ERRED IN DETERMINING THAT THE PLAINTIFFS ESTABLISHED A CONSTITUTIONALLY PROTECTED INTEREST IN A CONTINUED STATUS AS STUDENTS IN GOOD STANDING.**

¶14. As a preliminary matter, there is ambiguity in the chancellor's opinion regarding the basis on which the chancellor found Hughes's claim meritorious. In his complaint, Hughes based his action on three separate theories. Hughes alleged that his dismissal violated his due process and equal protection rights under the Fifth and Fourteenth Amendments of the United States Constitution and corresponding amendments of the state constitution. Hughes also claimed that the University's action constituted a breach of contract.

¶15. The chancellor found as follows:

There are a number of cases which seem to suggest that an academic institution has the unfettered right to modify its graduation requirements. . . . ....

However, it is grossly unfair to accept the proposition that an institution such as UMC has the unfettered liberty to modify graduation requirements well into the medical course. While respecting the long-accepted right of an academic institution to manage its academic affairs, the Court must note that in this case, the reliance interest of Mr. Hughes to be governed in his course progress as set out in the catalog then in force at the time of his admission was breached.

Had Mr. Hughes known in advance that UMC would limit the number of times a student could sit for the USMLE, he would have utilized his available chances more effectively. Here, UMC changes the rules mid-stream, and materially altered the standards Mr. Hughes thought he needed to maintain in his medical school course. This radical change of requirements is unreasonable and should not stand.

Mr. Hughes' argument that he had a vested contract with UMC should prevail. In accord with the prevailing law, UMC has every right to modify its academic regulations. But those modifications must be exercised within the framework of the law and must never be arbitrary or capricious. . . .

The Court has reviewed the testimony and the exhibits from the parties and has concluded that the claim by Mr. Hughes has merit. UMC is herewith ordered to clear Mr. Hughes so that he can sit for the USMLE Step I test at the next available sitting. This will at least protect Mr. Hughes' reliance interest, which is founded on the policies announced in the catalog which was in effect at the time of his admission.

¶16. Clearly, the chancellor found merit to Hughes's contract claim. However, it also appears that the chancellor found Hughes's right to substantive due process to have been violated by the University's actions, hence the discussion of arbitrary and capricious action on the part of the University. This lack of clarity in the chancellor's opinion is magnified by the fact that the chancellor cited Article 17 of the Mississippi Constitution in her opinion. There is no such article. One can only surmise that the chancellor intended to cite to either Article 3, § 14 regarding due process or possibly Article 3, § 16 regarding the impairment of contracts. Surely the chancellor did not intend to cite to Article 3, § 17 which deals with the taking of property for public use. Perhaps it is best to characterize the chancellor's finding as that of the district court in *Regents v. Ewing*, that is, the finding that Hughes had an implied contract right to continued enrollment free from arbitrary interference, which was breached by the University in violation of Hughes's due process rights. *Ewing*, 474 U.S. at 221, 106 S.Ct. at 511.

¶17. The lack of clarity in the chancellor's opinion apparently confused the University as well. In its argument to this Court, the University addresses the equal protection claim as well as the due process claim. The equal protection issue need not be reached by this Court as there is simply nothing in the chancellor's opinion to indicate that this issue was considered, or much less that it constituted a basis of the judgment rendered by the chancery court. The only other issue raised by the University on appeal is the question of whether the students had a constitutionally protected interest in continued enrollment at the University. Nevertheless, within the University's discussion of the due process issue, the University addresses the question of whether a contract existed between Hughes and the University. The existence of a contract goes, in essence, to both the due process issue as well as the contract issue. Therefore, the two will be here separately discussed, though the University combines the issues in its argument. Both are issues of first impression for this Court.

# A. CONTRACT CLAIM

¶18. Hughes contends that the University catalog constitutes a contract between the University and its students. Hughes alleges that, according to this contract, he was to receive a doctor of medicine degree if he paid his tuition and satisfied the academic requirements found in the school's catalog at the time of his enrollment. Because there was no requirement in the catalog that students must pass the USMLE in order to achieve the doctor of medicine degree at the time Hughes enrolled at UMC, Hughes maintains that the University breached this contract by requiring that he pass the USMLE within three attempts in order to receive the degree. Hughes does not question the validity of this requirement, but instead argues that the fact that it was applied to him was in violation of his contractual relationship with the school. The University argues that no contract existed between Hughes and the University.

¶19. There is little Mississippi law defining the relationship between the university and the student. The Fifth Circuit endorsed the deferential standard of review, discussed above, regarding a university's application of academic standards in *Davis v. Mann*, 882 F.2d 967 (5th Cir. 1989), a case in which a former dental resident brought an action against UMC challenging his termination from the residency program. *Davis* is not particularly helpful in evaluating the issue at hand, however, because the resident's suit in *Davis* was based on his employment contract with the University, not on the contractual student-university relationship alleged here by Hughes.

¶20. Numerous other jurisdictions have addressed this issue. There appears to be little doubt among these jurisdictions that the student-university relationship is contractual in nature and that the terms of the contract may be derived from a student handbook, catalog, or other statement of university policy. *See, e.g. Ross v. Creighton Univ.*, 957 F.2d 410 (7th Cir. 1992); *Doherty v. Southern College of Optometry*, 862 F.2d 570 (6th Cir. 1988); *Corso v. Creighton Univ.*, 731 F.2d 529 (8th Cir. 1984); *Mahavongsanan v. Hall*, 529 F.2d 448 (5th Cir. 1976); *Abbariao v. Hamline Univ. Sch. of Law*, 258 N.W.2d 108 (Minn. 1977); *Bleicher v. University of Cincinnati College of Med.*, 604 N.E.2d 783 (Ohio Ct. App. 1992); *University of Texas Health Science Ctr. at Houston v. Babb*, 646 S.W.2d 502 (Tex. Ct. App. 1982). In many instances, elements of the law of contracts have been applied to the student-university relationship, but rigid importation of the contractual doctrine has been rejected. *See, e.g., Corso v. Creighton Univ.*, 731 F.2d 529, 531 (8th Cir. 1984); *Lyons v. Salve Regina College*, 565 F.2d 200, 202 (1st Cir. 1977); *Mahavongsanan v. Hall*, 529 F.2d 448, 450 (5th Cir. 1976); *Slaughter v. Brigham Young Univ.*, 514 F.2d 622, 626 (10th Cir. 1975).

¶21. In *Mahavongsanan*, a graduate student sued Georgia State University, asserting a deprivation of her civil rights by the university's arbitrary and capricious refusal to award her a master's degree in education. She claimed denial of procedural and substantive due process, and breach of contract. The student had twice failed to pass a comprehensive examination required for graduation. The student alleged that the university breached its contract with her by requiring her to take the comprehensive examination to graduate, which was not a requirement when she enrolled. The court held that the student's contract claim was without merit "because of the wide latitude and discretion afforded by the courts to educational institutions in framing their academic degree requirements." *Id.* at 450. The court explained:

> Implicit in the student's contract with the university upon matriculation is the student's agreement to comply with the university's rules and regulations, which the university is entitled to modify so as to properly exercise its educational responsibility. The appellees' claim of a binding, absolute

unchangeable contract is particularly anomalous in the context of training professional teachers in post graduate level work

*Id.* (citing *Foley v. Benedict*, 55 S.W.2d 805, 810 (Tex. Comm'n App.1932)).

¶22. The United States District Court for the Middle District of Alabama in *Hammond v. Auburn Univ.*, 669 F. Supp. 1555 (M.D. Ala. 1987), *aff'd mem.* 858 F.2d 744 (11th Cir. 1988), reached a similar conclusion. In *Hammond*, a student brought a breach of contract action against the university when the university changed the degree requirements two years into the student's course work. When the student entered Auburn in 1982, the bulletin stated that a student must maintain a cumulative average of 2.00 on all work attempted at the university. In 1984, the university changed the academic requirements to mandate that students maintain a 2.00 average on all work attempted in the student's particular major together with the original requirement that a 2.00 cumulative average on all courses attempted at the university be maintained. The change was to become effective one year later in 1985. The court stated:

> Without finding specifically that the plaintiff had a binding contract with Auburn, this Court will assume, arguendo, that some sort of educational contract existed. . . . The law in this circuit is clear regarding breach of contract claims similar to the plaintiff's herein. Implicit in a student's educational contract with the University is the duty of the student to comply with the University's rules and regulations which the University can modify "so as to properly exercise its educational responsibilities." *Mahavongsanan*, 529 F.2d at 450.

669 F. Supp. at 1562. The court also noted that the bulletin expressly stated that the university reserved the right to make changes in the curricula which would govern formerly enrolled students. *Id.* Arguably, however, the court would have reached the same result even absent the express provision in the bulletin. Again, the court stated that the university's right to modify educational requirements is implicit in its contract with students. The fact that there was apparently no such provision in the university bulletin in *Mahavongsanan* did not prevent the Fifth Circuit from finding such a right implicit in all student-university contracts. For similar cases reaching like results, see *Doherty v. Southern College of Optometry*, 862 F.2d 570, 577 (6th Cir. 1988) (finding implied right to change academic degree requirements if changes are not arbitrary or capricious); *Easley v. University of Michigan Bd. of Regents*, 627 F. Supp. 580 (E.D. Mich. 1986) (university has an inherent right to modify degree requirements).

¶23. It is the conclusion of this Court, in keeping with the law of sister jurisdictions, that while the student-university relationship is contractual in nature, implicit in the university's general "contract" with its students is a right to change the university's academic degree requirements if such changes are not arbitrary or capricious. *Mahavongsanan*, 529 F.2d at 450. This conclusion is reached particularly in light of the great reluctance, expressed by numerous courts, including the United States Supreme Court, to intervene in the academic context. *See Ewing*, 474 U.S. at 226, 106 S.Ct. at 514. A strict view of contract law -- that it is a breach of contract for the University to modify its degree requirements in any instance after a student has enrolled -- is rejected. Such a rule would interfere unnecessarily in the University's discretion to manage its academic affairs. Moreover, a strict view of the parties' relationship would require the conclusion that a new contract was formed each semester when Hughes paid his tuition. The protection afforded students comes from an implied contract right to continued free enrollment free from arbitrary interference - the protection

afforded by the due process clause.

## B. DUE PROCESS

¶24. Hughes contends that his dismissal from the University violates his right to due process under the Fifth and Fourteenth Amendments of the United States Constitution and corresponding amendments of the Mississippi Constitution. Hughes does not allege that he was denied procedural due process by the University. Rather, he contends that the University's alleged breach of his contractual rights resulted in due process violations. Thus, his claim is one of substantive due process.

¶25. The conceptual analysis involved in a claim of substantive due process as follows: "The conceptual essence of 'substantive' due process is the notion that the Due Process Clause - in addition to setting procedural minimal for deprivations of life, liberty, or property - bars outright 'certain government actions regardless of the fairness of the procedures used to implement them.'" *Hall v. Board of Trustees of State Inst. of Higher Learning*, 712 So. 2d 312, 318 (Miss. 1998) (quoting *Brennan v. Stewart*, 834 F.2d 1248, 1255 (5th Cir. 1988); *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986)). In order to prevail on a substantive due process claim, a plaintiff must show that the government's deprivation of a property interest was arbitrary or not reasonably related to a legitimate governmental interest." *Hall*, 712 So. 2d at 319 (citing *Williams v. Texas Tech Univ. Health Sciences Ctr.*, 6 F.3d 290, 294 (5th Cir. 1993)). Thus, substantive due process analysis is not necessary unless Hughes had a protected property interest.[(2)]

### 1. PROPERTY INTEREST

¶26. Hughes argues that he was unlawfully deprived of an education under a valid property right in contract. The federal Constitution does not create property interests. *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709 (1972). Rather, property interests are creatures of state law. *Id.* The protected property interest found by the court below derives from Hughes's alleged state law contract right to continued enrollment free from arbitrary dismissal. This Court has stated that a contract right constitutes an enforceable property interest. *Wicks v. Mississippi Valley State Univ.*, 536 So. 2d 20, 23 (Miss. 1988) .

¶27. Although state law creates the property interest, it is federal constitutional law which determines whether that property interest rises to the level of a constitutionally protected interest. *Memphis Light, Gas & Water Div'n v. Craft*, 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978); *Board of Regents v. Roth*, 408 U.S. at 577, 92 S.Ct. at 2709, 33 L.Ed.2d 548 (1972); *Perry v. Sindermann*, 408 U.S. 593, 602, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972). In *Board of Regents v. Roth*, the Supreme Court set out its most definitive statement of "property" for purposes of the due process clause:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined....

408 U.S. at 577, 92 S.Ct. at 2709.

¶28. The University argues that the Supreme Court's decision in *Board of Curators v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L. Ed. 2d 124 (1978) is dispositive of the question at hand - that is, whether

Hughes was deprived of a property interest protected by substantive due process. *Horowitz* involved a challenge by a former medical student of her dismissal from the University of Missouri. The student was dismissed for academic deficiencies. The student did not argue that she had been denied a property interest. Rather, she argued that her dismissal had deprived her of a liberty interest by substantially impairing her opportunities to continue her medical education. *Horowitz*, 435 U.S. at 84-85, 98 S.Ct. at 952. The Supreme Court <u>assumed</u> the existence of a liberty or property interest and went on to find that the student had been provided as much due process as the Fourteenth Amendment requires. *Id.* Regarding the student's substantive due process claim, the Court again <u>assumed</u> that the courts can review under an "arbitrary and capricious" standard an academic decision of a public educational institution. *Horowitz*, 435 U.S. at 91-92, 98 S.Ct. at 956.

¶29. *Horowitz* is not dispositive of the question of whether Hughes was deprived of a protected property interest. Contrary to the University's assertions, the Supreme Court in *Horowitz* did not reject the student's claim that she had been deprived of a protected property interest. First, the student did not claim a property interest in *Horowitz*. Second, the Supreme Court, in assuming the existence of the student's claimed liberty interest, also stated that it was assuming the existence of a property interest. And finally, in addressing the student's substantive due process claim, the Court assumed that such an interest, if it even existed, would receive substantive due process protection under the Due Process Clause.

¶30. The Supreme Court engaged in a similar analysis in *Regents v. Ewing*, 474 U.S. 214, 106 S.Ct. 507, 88 L. Ed. 2d 523 (1985). Ewing was dismissed from the University of Michigan after failing the Part I of the National Board of Medical Examiners (NBME), the predecessor of the USMLE. In the fall of 1975 Ewing enrolled in a special 6-year program of study, known as "Inteflex," offered jointly by the undergraduate college and the medical school. An undergraduate degree and a medical degree are awarded upon completion of the program. In order to qualify for the final two years of the Inteflex program, Ewing was required to complete successfully four years of study and to pass Part I of the NBME. After overcoming academic difficulties, Ewing successfully completed the courses prescribed for the first four years of the Inteflex program. However, Ewing failed Part I of the NBME. Ewing was dismissed from the Inteflex program.

¶31. Ewing's complaint against the University asserted a right to retake the NBME based on the contention that the University's action constituted a breach of contract and was barred by the doctrine of promissory estoppel. Ewing also alleged that he had a property interest in his continued enrollment in the Inteflex program and that his dismissal was arbitrary and capricious, violating his substantive due process rights guaranteed by the Fourteenth Amendment.

¶32. Ewing's contract claim, based on state law, was rejected by the United States District Court for the Eastern District of Michigan. Ewing argued that the University had repeatedly engaged in the practice of allowing students to retake the examination. Ewing also argued that a promotional pamphlet released by the Medical School shortly before the examination had codified this practice. The pamphlet stated:

> [E]verything possible is done to keep qualified medical students in the Medical School. This even extends to taking and passing National Board Exams. Should a student fail either part of the National Boards, an opportunity is provided to make up the failure in a second exam.

The district court, in rejecting Ewing's contract claim, found that the University did not bind itself, either expressly or by course of conduct, to give Ewing another opportunity to take the examination. *Ewing*, 559

F. Supp. 791, 800 (E.D. Mich. 1983). The contract issue was not addressed by either the Court of Appeals or the Supreme Court.

¶33. Regarding Ewing's due process claim, the district court determined that Ewing had a constitutionally protected property interest in his continued enrollment in the Inteflex program and found that a state university's academic decisions concerning the qualifications of a medical student are subject to substantive due process review, but found no violation of Ewing's due process rights. *Ewing*, 559 F. Supp. at 798. The Court of Appeals agreed with the district court that Ewing's implied contract right to continued enrollment free from arbitrary interference qualified as a property interest protected by the Due Process Clause, but it concluded that the University had arbitrarily deprived Ewing of that property in violation of the Fourteenth Amendment. *Ewing*, 742 F.2d 913, 916 (6th Cir. 1984).

¶34. The Supreme Court reversed the judgment of the Court of Appeals, holding that the Court of Appeals had misapplied the doctrine of substantive due process. *Ewing*, 474 U.S. at 222, 106 S.Ct. at 511. The Court followed *Board of Curators v. Horowitz*, 435 U.S. 78, 91-92, 98 S.Ct. 948, 955-56, 55 L.Ed.2d 124 (1978), by assuming the existence of a constitutionally protectible property right in Ewing's continued enrollment. *Ewing*, 474 U.S. at 223, 106 S.Ct. at 512. The Court held that even if Ewing's assumed property interest gave rise to a substantive right under the Due Process Clause to continued enrollment free from arbitrary state action, the facts disclosed no such action on the part of the University. *Id.*

¶35. Again, the Supreme Court in both *Horowitz* and *Ewing* assumed that such an interest warrants substantive due process protection. Thus, neither supports the University's assertion in the case at hand that Hughes's property interest does not warrant substantive due process protection. In fact, the Court in *Horowitz* noted that "a number of lower courts have implied in dictum that academic dismissals from state institutions can be enjoined if shown to be clearly arbitrary or capricious." *Horowitz*, 435 U.S. at 92, 98 S.Ct. at 956 (citing *Mahavongsanan*, 529 F.2d at 449-50; *Gaspar v. Bruton*, 513 F.2d at 850 and citations therein).

¶36. The cases involving public universities demonstrate that a student's interest in attending a university is a property right protected by at least the procedural protections of the due process clause. *See, e.g., Gaspar v. Bruton*, 513 F.2d 843, 850 (10th Cir. 1975); *Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150 (5th Cir. 1961). However, there is disagreement among the courts as to whether a state-created property interest such as the contract right at hand is a property interest warranting substantive due process protection. Justice Powell, in his concurring opinion in *Ewing*, expressed reservations regarding the majority's assumption that a substantive due process right existed in that case. Justice Powell asserted that not all property rights are entitled to the protection of substantive due process. He stated that "[w]hile property interests are protected by procedural due process even though the interest is derived from state law rather than the Constitution, ... substantive due process rights are created only by the Constitution." *Ewing*, 474 U.S. at 229, 106 S.Ct. at 515. Justice Powell would have held that the student's interest was not entitled to the protection of substantive due process, noting that as a state law contract right it bore "little resemblance to the fundamental interests that previously have been viewed as implicitly protected by the Constitution." *Id.* at 229-30, 106 S.Ct. at 516. *Cf. Harrah Independent Sch. Dist. v. Martin*, 440 U.S. 194, 99 S.Ct. 1062, 59 L.Ed.2d 248 (1979) (reviewing non-renewal of a tenured teacher's contract under a substantive due process analysis).

¶37. The Fifth Circuit has declined to adhere to Justice Powell's reservations. In *Schaper v. City of Huntsville*, 813 F.2d 709 (5th Cir.1987), the Fifth Circuit confronted the question of whether a public employee has a substantive due process right by virtue of his state property interest in continued employment. The City relied on Justice Powell's concurrence in *Ewing* in arguing that the employee had no substantive due process right in his continued employment. The *Schaper* Court noted the *Ewing* majority's implication that substantive due process rights may be created the same way procedural due process rights are created, by state law, via the majority's assumption of the existence of a constitutionally protectible property right in Ewing's continued enrollment. *Schaper*, 813 F.2d at 716 (citing *Ewing*, 106 S.Ct. at 512). In concluding that the employee had a substantive due process right in continued employment, the *Schaper* Court noted that in *Russell v. Harrison*, 736 F.2d 283, 288 (5th Cir. 1984), it found that a complaint alleging an arbitrary and capricious deprivation of a property interest states a cause of action under the Due Process Clause. The *Schaper* Court summarized the disagreement among other circuits as follows:

> The Eleventh Circuit has expressly found that "the 'deprivation of a property interest for an improper motive and by means that [are] pretextual, arbitrary and capricious' constitutes a substantive due process violation. *Barrett v. Housing Authority*, 707 F.2d 1571, 1577 (11th Cir. 1983) (quoting *Hearn v. City of Gainesville*, 688 F.2d 1328, 1332 (11th Cir. 1982)). Similarly, the Eighth Circuit has reviewed deprivations of state conferred property rights for violations of substantive due process. *Moore v. Warwick Public School District No. 29*, 794 F.2d 322, 328-29 (8th Cir. 1986); *O'Neal v. City of Hot Springs Nat'l Park*, 756 F.2d 61, 63 (8th Cir. 1985). The Tenth Circuit, however, has specifically rejected substantive due process review when the deprived interest does not rise to constitutional dimensions. In *Mangels v. Pena*, 789 F.2d 836 (10th Cir. 1986), the court stated that "[r]ights of substantive due process are founded not upon state provisions but upon deeply rooted notions of fundamental personal interests derived from the Constitution." *Id.* at 839 (citing *Regents of the Univ. of Michigan v. Ewing*, 474 U.S. 214, 106 S.Ct. 507, 515-16, 888 L.Ed.2d 523 (1985) (Powell, J., concurring)).

*Schaper*, 813 F.2d at 717 n.8. The Sixth and Seventh Circuits have likewise expressed doubts that substantive due process protects state-created property rights. *See Illinois Psychological Ass'n v. Falk*, 818 F.2d 1337, 1342 (7th Cir.1987); *McMaster v. Cabinet for Human Resources*, 824 F.2d 518, 523 (6th Cir.1987); *Brown v. Brienen*, 722 F.2d 360, 367 (7th Cir.1983). The Sixth Circuit which found a property right in *Ewing* and was reversed, has observed that the Supreme Court's holding casts doubt on the existence of such a right. *Megenity v. Stenger*, 27 F.3d 1120, 1122 (6th Cir.1994).

¶38. This Court has held that school age children in Mississippi enjoy the full substantive and procedural protections of the due process clause of the Constitution of Mississippi, whatever construction may be given to the Constitution of the United States. *Clinton Mun. Separate Sch. Dist. v. Byrd*, 477 So. 2d 237, 240 (Miss. 1985). In *Byrd*, this Court labeled as fundamental the right to a minimally adequate public education. *Id.* This right, the Court noted, is created by the laws of this state, through which the state has accepted the responsibility of the provision of free public education. *Id.* (citing Miss.Code Ann. § 37-1-2(f) (Supp.1984) (declaring a part of the public policy of this state the provision of "quality education for all school age children in the state"); Miss.Code Ann. § 37-1-2 (Supp.1984) (recognizing the effect of education "upon the social, cultural and economic enhancement of the people of Mississippi"). *Byrd*, however, is not dispositive of the question at hand. *Byrd* is based on state statutes that guarantee a free public education through high school and compel the student's attendance at school. *Cf. Goss v. Lopez*,

419 U.S. 565, 95 S.Ct. 729, 42 L. Ed. 2d 725 (1975). There are no similar statutes that confer any right to a free graduate or professional school in Mississippi.

¶39. This Court need not reach the issue of whether Hughes' interest in continued enrollment warrants substantive due process protection. Following the lead of the Supreme Court in *Horowitz* and *Ewing*, assuming, arguendo, for purposes of this opinion, that a constitutional right to continued enrollment free from arbitrary state action is implicated, this Court cannot conclude that Hughes was treated in a manner completely devoid of reasoned academic decision making. The facts of the record disclose no such arbitrary action.

### 2. SUBSTANTIVE DUE PROCESS

¶40. The University asserts that, in holding that the University's actions were arbitrary and capricious, the chancery court impermissibly intruded upon the University's academic authority. In evaluating a substantive due process claim based on allegedly arbitrary state action, a judge may not override the faculty's professional judgment in academic matters unless "it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Ewing*, 474 U.S. at 225, 106 S.Ct. at 513. The test for a violation of substantive due process is "whether the governmental action is rationally related to a legitimate governmental purpose." *Exxon Corp. v. Maryland*, 437 U.S. 117, 124-25, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *Everhart v. Jefferson Parish Hosp. Dist. No. 2*, 757 F.2d 1567, 1571 (5th Cir. 1985). The test has been used interchangeably with the "arbitrary and capricious" standard, in the context of educational and other state institutions. *See Hall v. Board of Trustees of State Inst. of Higher Learning*, 712 So. 2d at 319 (stating that plaintiff must show that government's deprivation of property interest was arbitrary or not reasonably related to a legitimate governmental interest). In *Ewing* the Supreme Court made plain the narrow standard of review applicable to academic decisions:

> When judges are asked to review the substance of a genuinely academic decision... they should show great respect for the faculty's professional judgment. Plainly they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

*Ewing*, 474 U.S. at 225, 106 S.Ct. at 513.

¶41. Courts have invoked different protections for disciplinary and academic expulsions. A disciplinary dismissal requires that the student be given oral or written notice of the charges and evidence against him and the opportunity to present his side of the story. *Goss v. Lopez*, 419 U.S. 565, 581, 95 S.Ct. 729, 739, 42 L.Ed.2d 725 (1975). In contrast, an academic dismissal calls for far less stringent procedural requirements. *Horowitz*, 435 U.S. at 86, 98 S.Ct. at 953. The Supreme Court in *Horowitz* held that due process does not require any hearing before a medical school or university dismissed a student for academic reasons. *Horowitz*, 435 U.S. at 90, 98 S.Ct. at 955. Nevertheless, if a student's expulsion results from the arbitrary, capricious, or bad-faith actions of university officials, the judiciary will intervene and direct the university to treat the student fairly. *Mahavongsanan v. Hall*, 529 F.2d 448 (5th Cir. 1976); *Gaspar v. Bruton*, 513 F.2d 843 (10th Cir. 1975); *Greenhill v. Bailey*, 519 F.2d 5 (8th Cir. 1975).

¶42. Dr. Lincoln Arceneaux, associate dean of student affairs for the School of Medicine, testified regarding the basis for the decision of the Executive Faculty of the School of Medicine in requiring that a student pass

the USMLE Step 1 before being promoted to the junior year. He explained that the Federation of State Medical Boards and the National Board of Medical Examiners require a student to pass the USMLE in order to be licensed. The State Board of Medical Licensure requires that in order to begin residency training in Mississippi, a student must have passed Step 1 and Step 2 of the USMLE and must have received the M.D. degree. Dr. Arceneaux stated that the School of Medicine adopted the requirement that a student pass Step 1 for promotion to the junior year and the requirement that a student pass Step 2 prior to certification for the M.D. degree so an individual who received an M.D. degree from the University would be qualified for entry into residency training in Mississippi. The requirement, passed by the Executive Faculty on September 28, 1993, went into effect in June 1994. This is a requirement set by the majority of medical schools nationwide. Dr. Arceneaux explained that Step 1 is given upon completion of the junior year in medical school because the subjects tested on Step 1 coincide with the subjects studied by students up to that point in their medical school career.

¶43. At the time the measure was passed, Hughes, who was just beginning his sophomore year in medical school, had not yet taken the USMLE Step 1. At the time, he was clearly warned of the danger failing the test posed to his continuance in medical school. Hughes testified that Dr. Arceneaux held a meeting with the sophomore students at which he explained the new measure. Hughes testified that there was some confusion among the class members as to how many chances they would have to pass the examination. However, it is also clear from Hughes's testimony that at the class meeting, it was clear that the new measure limited the number of times students could take the Step 1 examination. Hughes claims that he did not receive notice of the measure until March 1995 when he had already taken and failed the Step 1 exam twice. However, at the time the Executive Faculty passed the new requirement, not only did Dr. Arceneaux meet with the sophomore class, but a memorandum was also circulated by Dr. Arceneaux to all sophomore students, dated September 29, 1993. Again, the memorandum stated:

> Following action by the Executive Faculty of the University of Mississippi School of Medicine on September 28, 1993, sophomore medical students 1993-94 are required to take the USMLE Step I in June, 1994 and pass this examination as an additional requirement for promotion to the junior medical year.

> Sophomore medical students 1993-94 who have fulfilled all other requirements for promotion, but who fail the June, 1994 USMLE Step I, may be allowed to enroll on a contingent basis for the first junior medical block beginning August/September, 1994; however, such a student will be required to repeat and pass the Step I examination in September, 1994 in order to continue with the junior year in 1994-95. Any such student who fails the repeat USMLE Step I in September, 1994 must repeat and pass the Step I examination in June, 1995 in order to be promoted to the M-3 year for 1995-96.

¶44. Hughes testified that he did not realize that he would be dismissed from medical school because the memorandum states only that he would not be promoted to his junior year. However, the memorandum clearly warns students of the danger failing the test posed to continuance in medical school and, ultimately, to receipt of the M.D. degree. The new regulation was made a part of the 1994-95 bulletin. Hughes took the USMLE for the first time in June 1994.

¶45. Still, even assuming the above did not constitute notice of the change in requirements to Hughes, one and one-half years later, after the requirement had been in effect nearly one year and after Hughes had been given the opportunity to take the test twice, Hughes received a copy of the new policy from Dr. Arceneaux.

The memorandum clearly stated that a student would be dismissed upon failure to pass the examination by the third attempt. Hughes received this memorandum in March 1995, more than two months prior to Hughes' third attempt at the test.

¶46. The decision making of the Executive Faculty went beyond passing the new requirement. Hughes was permitted to appeal his dismissal in September 1995. He was informed that his appeal could include such counsel, witnesses, documents or other recommendation that he deemed pertinent. At the appeal, the Executive Faculty reviewed Hughes's unenviable academic record, which included numerous academic difficulties, and ultimately voted to dismiss Hughes from medical school. The decision by the Executive Faculty did not prohibit Hughes from re-applying at the University or from applying elsewhere. The record clearly shows that Hughes was treated in a fair and reasonable manner. Also, there were two other students dismissed along with Hughes for failing to pass the examination on the third attempt. The regulation, applicable to all students, was applied even-handedly.

¶47. It cannot be said that the Executive Faculty's decision to pass the requirement was devoid of reasoned academic decision making or that it is not rationally related to the Medical School's legitimate function of educating physicians. Furthermore, particularly in light of the great deference due faculty judgments resulting in academic dismissals, the Executive Faculty's decision to apply the requirement to Hughes cannot be said to be arbitrary and capricious. The record reveals no evidence which would cause this Court to doubt the motives of the University, and the record contains substantial evidence that the University treated Hughes according to a set policy, applicable to all students, in light of his academic performance. The policy was rationally related to the University's legitimate function of educating physicians. Hughes was certainly granted ample procedural considerations. Having taken the aforementioned into consideration, this Court holds that the chancery court erred in finding that the University acted arbitrarily and capriciously in violation of Hughes's substantive due process rights.

## CONCLUSION

¶48. The chancery court erred in holding that the University acted arbitrarily and capriciously in depriving Hughes of a contractual right to continued enrollment. The judgment of the chancery court ordering the University to readmit Christopher W. Hughes and Eric Beasley for the purpose of one additional opportunity to take the examination is reversed, and judgment is rendered here denying all relief sought by Hughes and Beasley and finally dismissing their complaints and this action with prejudice.

¶49. **REVERSED AND RENDERED.**

> **PRATHER, C.J., PITTMAN, P.J., MILLS, WALLER AND COBB, JJ., CONCUR. BANKS, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY McRAE AND DIAZ, JJ. McRAE, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY BANKS, P.J.**

> BANKS, PRESIDING JUSTICE, DISSENTING:

¶50. I respectfully dissent.

¶51. As noted by the majority, several jurisdictions have agreed that the catalog serves as a contract between the school and the students. *See, e.g., **Ross v. Creighton Univ.***, 957 F.2d 410 (7th Cir. 1992); ***Doherty v. Southern College of Optometry***, 862 F.2d 570 (6th Cir. 1988); ***Corso v. Creighton***

*Univ.*, 731 F.2d 529 (8th Cir. 1984); *Mahavongsanan v. Hall*, 529 F.2d 448 (5th Cir. 1976); *Abbariao v. Hamline Univ. Sch. of Law*, 258 N.W.2d 108 (Minn. 1977); *Bleicher v. University of Cincinnati College of Med.*, 604 N.E.2d 783 (Ohio Ct. App. 1992); *University of Texas Health Science Ctr. at Houston v. Babb*, 646 S.W.2d 502 (Tex. Ct. App. 1982).

¶52. Here, a clause in the catalog states that the rules are subject to change. Of course, the school has an interest in updating and advancing its curriculum to meet higher standards to continue to further its students level of educational attainment. However, absent some written assurance of what is expected of them, how is the student protected from sudden changes? In my view, there must be a rule of reasonableness with respect to changing requirements for progress and graduation once a student has committed to the school based upon the written representation of the school with respect to its requirements. Our task, here then is to determine whether the chancellor erred in determining that the changes made here and the manner of their implementation fell short of that which is reasonable.

¶53. Here, the school raised the hurdles in the middle of the race. Moreover, after the race, Christopher W. Hughes is left with only two options, quit or start over. This is neither justice nor the law of this state.

¶54. Because this state has not considered this specific issue, the majority looks elsewhere for support. Nevertheless, the majority's reliance on *Hammond* and *Mahavongsanan* is misplaced. In each of those cases the student was given some option to either continue in another school, without reapplying, or take additional classes. UMC did not give these options to Hughes. On the contrary, Hughes was faced with two alternatives, start over or quit.

¶55. In *Mahavongsanan*, Mahavongsanan was confronted with the university's new comprehensive examination requirement. *Mahavongsanan v. Hall*, 529 F.2d 448, 450 (5th Cir. 1976). Mahavongsanan had already begun school before the university adopted that comprehensive examination requirement. However, there, the school gave Mahavongsanan the opportunity to complete additional course work in lieu of the comprehensive examination. *Id*. at 450. Instead of taking that option, she brought suit. The court did not find error in the school's action.

¶56. Also, in *Hammond v. Auburn Univ.*, 669 F. Supp. 1555, 1561 (M.D. Ala.1987), *aff'd mem.*, 858 F. 2d 144 (11th Cir. 1988), the court upheld Hammond's dismissal from Auburn University's College of Engineering. Nevertheless, the court made note that Hammond was not dismissed from Auburn University, but rather, "only one avenue was closed to him." Hammond was permitted to pursue any other curricula offered at Auburn. *Id*. at 1558. Moreover, the case does not suggest that Hammond could not apply to another Engineering school.

¶57. Here, Hughes's only avenue is closed to him. He cannot continue at UMC's medical school. Moreover, he cannot enter another school with his status at UMC. The harsh reality of his situation is that he cannot be a doctor as a result of failing a test that he was forced to take prematurely.

¶58. This case is similar to *University of Texas Health Science Ctr. v. Babb*, 646 S.W.2d 502 (Tex. Ct. App. 1982). There, Babb entered nursing school, under the requirements of the school's 1978-1979 catalog. Babb withdrew from school after receiving failing grades. When she reentered school, the 1979-1981 catalog contained a new restriction not in the former catalog that required a student receiving more than two D's in the program to withdraw. *Id.* at 504. There, the court held that a school's catalog constitutes a written contract between the educational institution and the patron, where entrance is had

under its terms. *Id*. at 506. The court held that the student had a right to rely on the terms of the 1978-1979 catalog. *Id*. The court held that the 1978-1979 catalog allowed a student to complete the degree requirements under its terms, within a six-year period, despite the school's later amendments to the catalog. *Id*.

¶59. Here, UMC changed the requirements of the catalog. Hughes did not meet those requirements. Nevertheless, I find the reasoning of *Babb* persuasive. Hughes is entitled to continue his matriculation according to the catalog that was in place at the time he entered UMC.

¶60. A party asserting equitable estoppel must show (1) that he has changed his position in reliance upon the conduct of another and (2) that he has suffered detriment caused by his change of his position in reliance upon such conduct. *Ivy v. Grenada Bank*, 401 So.2d 1302, 1303 (Miss.1981); *Thomas v. Bailey*, 375 So.2d 1049, 1052 (Miss.1979); *Birmingham v. Conger*, 222 So.2d 388, 392-93 (Miss.1969). Moreover, it is not necessary for the chancellor to make an express finding of detrimental reliance for such a proposition to stand. *PMZ Oil Co. v. Lucroy*, 449 So.2d 201, 205 (Miss. 1984). This Court looks to the opinion as a whole to determine the basis for the opinion. *Id*. at 205.

¶61. In *PMZ Oil Co.*, this Court upheld a chancellor's holding that the Lucroys had relied to their detriment based on representations made by PMZ/Pinkston. *Id*. There, the Lucroys purchased their home lot in reliance of the representation that it would be an exclusive single-family residential. *Id*.

¶62. Here, Hughes relied on the catalog in place when he entered medical school. Hughes spent money and time pursing his medical degree in accordance with that catalog. The record reflects that he reasonably thought he would have six times to take the exam because that was the practice at the time he entered school. Under that catalog, he would have six times to take the exam. Moreover, the chancellor recognized Hughes's detrimental reliance. Specifically, the chancellor stated as follows:

> UMC is herewith ordered to clear Mr. Hughes so that he can sit for the USMLE Step I test at the next available sitting. This will at least protect Mr. Hughes' *reliance interest, which is founded on the policies announced in the catalog which was in effect at the time of his admission*.

(emphasis added).

¶63. I agree.

**McRAE AND DIAZ, JJ., JOIN THIS OPINION.**

**McRAE, JUSTICE, DISSENTING:**

¶64. Christopher W. Hughes and Eric Beasley (collectively "Hughes") had vested constitutional and contract rights to continue their studies at the University of Mississippi Medical Center ("UMC") under the rules and regulations existing at the time of his admission and enrollment. Hughes incurred substantial expenses in attending UMC and completed all other requirements for promotion, except for passing the USMLE. It was a direct violation of Hughes's contract rights to change the rules after two years of medical school, which led to his expulsion. Hughes should be reinstated and allowed to continue his work towards graduation. Accordingly, I dissent.

¶65. When Hughes applied and was accepted to medical school at UMC in August of 1992, all students

were required to maintain a grade point average of 75 or higher in order to advance to the next year and eventually graduate. The United States Medical Licensing Examination ("USMLE") was **not** part of that requirement. The USMLE was also **not** a requirement for promotion or graduation. The USMLE was a requirement for medical license but **not** a requirement to get an MD degree. Two years later, during Hughes's third year of medical school, the rules were amended to require students not only to have a 75 average but also to have passed the USMLE. Having already taken and failed the test twice prior to this amendment, Hughes took the test a third time and failed, resulting in his expulsion.

¶66. A violation of Hughes's due process occurred with the rule change, as it was against his contractual interest. Hughes had already incurred substantial monetary debt in relying upon the original rules. While it is true that states are given wide latitude in setting academic standards, that is not the issue. The issue is whether such changes can affect a student who had already completed two years of medical school. The majority is forced to rely on law from other jurisdictions in its decision, as this state affords no guidance in cases dealing with a university drastically changing its educational requirements "mid-stream." However, none of those cases are on point with the issue at hand. Perhaps a better way of analyzing this case is to look at the policy this state has adhered to in similar circumstances involving its universities.

¶67. Analogous to this scenario was the removal of the "diploma privilege" from University of Mississippi School of Law graduates some two decades ago. Prior to 1979, graduates of the University of Mississippi School of Law were admitted to practice law in Mississippi upon graduation without being required to take and pass the state's bar exam. When the change went into effect, students currently enrolled at the university were exempted from the rule and allowed to practice law upon graduation without passing the bar exam. Hughes should be afforded the same accommodation.

¶68. The majority points to and focuses on the fact that Hughes earned grades while attending medical school which were barely high enough to move on to the next year. However, Hughes's grades were high enough to get promoted, and he would not have been dismissed from school had the new requirement not been implemented.

¶69. The prohibition against taking the property of another without due process is created in order to protect vested rights. "[v]ested in rights include not only legal and equitable title to enforcement of demand, but also an exemption from new obligations created after the right is vested." Vested rights may be created by common law, statute or contract. The chancery court applied this reasoning in ordering that Hughes be allowed to take the exam again. The court wrote:

> [It] is grossly unfair to accept the proposition that an institution such as UMC has the unfettered liberty to modify the graduation requirements well into the medical course. While respecting the long-accepted right of an academic institution to manage its academic affairs, the court must note that in this case, the reliance interest of Mr. Hughes to be governed in his course progress as set out in the catalog then in force at the time of his admission was breached.

> Had Mr. Hughes known in advance that UMC would limit the number of times a student could sit for the USMLE he would have utilized his available chances more effectively. Here, UMC changed the rules mid-stream, and naturally altered the standards Mr. Hughes thought he needed to maintain in his medical school course. This radical change of requirements is unreasonable and should not stand.

¶70. Neither the university nor the majority have shown that the change in regulations was reasonable as it

applied to Hughes. The contractual agreement between Hughes and UMC provided that he enter medical school and abide by the regulations **in existence at that time** in order to receive a medical degree. UMC breached this contract and stripped Hughes of his vested rights in an education and a medical degree. Accordingly, I dissent.

**BANKS, P.J., JOINS THIS OPINION.**

[(1)](#)Hughes had a difficult time maintaining the academic standards of the School of Medicine. His medical school record indicates a pattern of academic difficulties. His overall average at the completion of his freshman year was 74.6. Hughes was informed by the Executive Faculty, a body composed of the chairpersons of all basic sciences departments and all clinical sciences departments in the School of Medicine, that he must repeat the freshman year. However, when Hughes appealed this decision, the Executive Faculty allowed him to continue to his sophomore year. At the completion of his sophomore year, Hughes had raised his overall average to 78.

[(2)](#)Substantive due process also protects against arbitrary deprivation of liberty interests. Hughes, however, alleges no deprivation of a liberty interest.